## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SPRING WAY CENTER, LLC; JOHN and NANCY MORATIS; and NANCY WEHRHEIM,<br><br>     Plaintiffs,<br><br>v.<br><br>WEST PENN MULTI-LIST, INC; EVEREST CONSULTING GROUP LP (d/b/a Berkshire Hathaway HomeServices The Preferred Realty); NRT PHILADELPHIA LLC (d/b/a Coldwell Banker Realty); PPSIR, LLC (d/b/a Piatt Sotheby's International Realty); PIRAIN ENTERPRISES, INC. (d/b/a NextHome PPM Realty); MHDM LLC (d/b/a Realty ONE Group Gold Standard); SF, LLC (d/b/a Realty ONE Group Platinum); and REALTY ONE GROUP HORIZON, LLC,<br><br>     Defendants. | Civil Action No. 2:23-cv-2061<br><br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiffs, Spring Way Center, LLC, John and Nancy Moratis, and Nancy Wehrheim, through undersigned counsel, bring this action on behalf of themselves and all similarly situated individuals and state as follows:

### NATURE OF THE ACTION

1. Plaintiffs, individuals who sold residential real estate that was listed on West Penn Multi-List, Inc.'s multiple listing service ("MLS") during the past four years, bring this action against Defendants for agreeing, combining, and conspiring to impose and enforce rules and practices in the western Pennsylvania residential real estate market that force home sellers to pay artificially inflated commissions on the sale of their homes, in violation of federal antitrust law.

1

2.    Defendants are West Penn Multi-List, Inc. ("West Penn MLS") and several real estate brokerages operating in western Pennsylvania, namely: Everest Consulting Group LP (d/b/a Berkshire Hathaway HomeServices The Preferred Realty); NRT Philadelphia LLC (d/b/a Coldwell Banker Realty); PPSIR, LLC (d/b/a Piatt Sotheby's International Realty); Pirain Enterprises, Inc. (d/b/a NextHome PPM Realty); NextHome Dynamic, Inc.; MHDM LLC (d/b/a Realty One Group Gold Standard); SF LLC (d/b/a Realty One Group Platinum); and Realty One Group Horizon, LLC (collectively, the "Broker Defendants").

3.    In short, Defendants have adopted and enforced the so-called "Buyer Broker Commission Rule." According to this rule—first promulgated by the National Association of Realtors ("NAR") and then agreed to and implemented by Defendants in western Pennsylvania—every seller's broker, when listing a property on West Penn MLS's multiple listing service, must make a blanket, unilateral offer of compensation to any other West Penn MLS subscriber broker who procures a buyer for the home.

4.    The Buyer Broker Commission Rule is manifestly anticompetitive because, among other ill-effects, it compels the seller to compensate the broker representing the purchaser even though that broker should be working for the purchaser, not the seller; it mandates a "blanket offer," meaning that the same compensation must be offered to every buyer's broker, regardless of skill, experience, or the services provided; and it has the effect of encouraging "steering" by buyer-brokers, because it incentivizes them to direct their clients to properties with higher commission offers.

5.    As a result, home sellers generally pay between 5-6% of the total sale price of their home in broker commissions—although total commissions in western Pennsylvania range as high

as 7%—with the seller's broker (the "Listing Broker") and the purchaser's broker (the "Buyer Broker") typically splitting the commission.

6.      In developed markets outside the United States, purchasers compensate their own brokers (if they use one at all), typically paying less than half the rate paid to buyer brokers in the U.S.  For example, according to the Executive Director of the Consumer Federation of America, total commission rates in "a number of developed countries" range "between 1% and 4%" yet commissions in the U.S. remain fixed between 5% and 6%, which is "no lower than it was in 2001."[1]

7.      Indeed, a 2015 report, commissioned by NAR to study negative emerging trends in the real estate industry, highlighted concerns that total commissions in the United States are inflated compared to international markets, such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium. According to this report, in those countries the average total commissions ranges between 1% and 3%.[2]

8.      Furthermore, these inflated commissions have persisted despite technological advances—principally the development of easily accessible, public-facing websites that make it easier for home buyers to find properties, thereby significantly reducing the traditional utility of a Buyer Broker—that would reasonably have been expected to lower costs.

9.      Defendants' anticompetitive practices are not unique; rather, they are part and parcel of nation-wide collusion within the real estate industry to maintain inflated commissions. Recently, a federal jury in *Burnett, et al. v. The National Association of Realtors, et al.*, 4:19-cv-

---

[1]   FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_ segment_3.pdf.
[2] Swanepoel Group, D.A.N.G.E.R Report, at 22 (definitive analysis of negative game changers emerging in real estate) (2015). The report also suggests that total commissions in Germany range between 3% and 6%.

3

00332-SRB, in the Western District of Missouri, found that the same rules, policies, and practices as those alleged in this Complaint violated federal antitrust law. That jury imposed a historic ten-figure judgment on the defendants.

10.    Like the defendants in *Burnett*, Defendants' conduct unlawfully restrains trade and competition, harms home sellers in the form of inflating the cost of selling a house, and is, therefore, violative of federal antitrust law. For these violations, Plaintiffs seek treble damages under federal antitrust law, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees. Plaintiffs demand a trial by jury on all issues so triable.

## PARTIES

**Plaintiffs**

11.    Plaintiff Spring Way Center LLC ("Spring Way") is a Pennsylvania limited liability company. Spring Way sold a house located in Freedom, Pennsylvania, on or about September 8, 2023. Spring Way used Coldwell Banker Realty as its listing broker. Spring Way paid a total commission of 5% for the sale of the property.

12.    Plaintiffs John and Nancy Moratis are residents and citizens of Pennsylvania. They sold a house located in Rockwood, Pennsylvania, on or about December 3, 2021. The Moratis's used Berkshire Hathaway HomeServices The Preferred Realty as their listing broker. The Moratis's listing agreement provided for a total commission of 7% on the sale of their home, with 3.5% earmarked to compensate a broker representing the purchaser.

13.    Plaintiff Nancy Wehrheim is a resident and citizen of Pittsburgh, Pennsylvania. Wehrheim sold a property in the Pittsburgh region on or about July 2021. Wehrheim used Coldwell Banker Realty as her listing broker.

4

**Defendants**

14.     Defendant West Penn Multi-List, Inc. ("West Penn MLS") is a Pennsylvania membership corporation with its principal place of business at 8980 Perry Highway, Pittsburgh, Pennsylvania 15237. West Penn MLS is a corporation comprising thousands of real estate professionals based in the Pittsburgh metropolitan area and surrounding counties, including Allegheny, Armstrong, Beaver, Butler, Washington, Westmoreland, Clarion, Crawford, Fayette, Greene, Indiana, Lawrence, Mercer, Somerset, Venango and Erie (the "Service Area").

15.     Defendant Everest Consulting Group LP (d/b/a Berkshire Hathaway HomeServices The Preferred Realty) is a Pennsylvania limited partnership and licensed real estate brokerage operating within the western Pennsylvania region. Everest (under its d/b/a) and/or the brokers and agents it employs are members of the West Penn MLS. Everest Consulting Group LP's principal office is located at 9840 Old Perry Highway, Wexford, PA 15090.

16.     NRT Philadelphia LLC (d/b/a Coldwell Banker Realty) is a Delaware limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. NRT Philadelphia's western Pennsylvania offices (under its d/b/a) and/or the brokers and agents it employs in the region are members of the West Penn MLS. NRT Philadelphia's principal office is located at 390 Waterloo Boulevard, Exton, PA 19341. NRT Philadelphia maintains offices throughout the Service Area.

17.     PPSIR, LLC (d/b/a Piatt Sotheby's International Realty) is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. PPSIR, LLC (under its d/b/a) and/or the brokers and agents it employs in the region are members of the West Penn MLS. PPSIR, LLC's principal office is located at 260 Forbes Avenue, Suite 1525, Pittsburgh, PA 15222.

5

18.     Pirain Enterprises Inc. (d/b/a NextHome PPM Realty) is a Pennsylvania corporation and licensed real estate brokerage operating within the western Pennsylvania region. Pirain Enterprises (under its d/b/a) and/or the brokers and agents it employs in the region are members of the West Penn MLS. Pirain Enterprises' principal office is located at 1308 Peermont Avenue, Pittsburgh, PA 15216.

19.     MHDM LLC (d/b/a Realty ONE Group Gold Standard) is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. MHDM LLC, along with the brokers and agents it employs, are members of the West Penn MLS. MHDM LLC maintains an office at 11171 Perry Highway, Wexford PA, 15090.

20.     SF, LLC (d/b/a Realty ONE Group Platinum) is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. SF, LLC, along with the brokers and agents it employs, are members of the West Penn MLS. SF, LLC maintains an office at 427 Cochran Road, Pittsburgh, PA 15228.

21.     Realty ONE Group Horizon, LLC is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. Realty ONE Group Horizon, LLC, along with the brokers and agents its employs, are members of the West Penn MLS. Realty ONE Group Horizon, LLC, maintains an office at 3731 William Penn Highway, Murrysville, PA 15668.…

22.     Each of the named Defendants is a subscriber to West Penn MLS and does a significant amount of business in this District.

**Co-Conspirators**

23.     In addition to the named Defendants, realtor associations in the western Pennsylvania region (including, among others, the Pennsylvania Association of Realtors and the Realtors Association of Metropolitan Pittsburgh) and other brokerages operating within that

6

geographic area, among others, participated as co-conspirators in the violations alleged in this Complaint.

24.     These co-conspirators participated in the violations by, for example, agreeing to, complying with, and enforcing the Buyer Broker Commission Rule.

25.     Defendants are jointly and severally liable for the acts of their co-conspirators whether or not those co-conspirators are named as defendants in this Complaint.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over Plaintiffs' antitrust claim pursuant to 28 U.S.C. § 1331 because Plaintiffs' claim arises under the laws of the United States, specifically the Sherman Antitrust Act, 15 U.S.C. § 1.

27.     The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the proposed class comprises more than 100 persons, the total amount in controversy exceeds $5 million, and at least one member of the class is a citizen of a state different from Defendants.

28.     This Court has personal jurisdiction over Defendants, each of which maintains offices in Pennsylvania and conducts significant business within the Commonwealth and this District.

29.     Venue is appropriate in this District because Defendants maintain offices and places of business in western Pennsylvania, which includes this District; all of the real estate transactions that form the basis for this Complaint occurred in this District; and most of the class members reside in this District.

4879-6049-2181 v3

## FACTUAL ALLEGATIONS

**Real Estate Industry Background**

30.     Real estate brokers play an important role in the residential real estate market, facilitating transactions by marketing properties listed for sale, helping buyers find properties, assisting with negotiations, and the like.

31.     Most brokers and their individual realtors or agents do not work exclusively with buyers or sellers; that is, a broker/agent may act as the seller broker in some sales and act as the buyer broker in others.

32.     According to a survey published by the National Association of Realtors ("NAR") in 2022, about 90% of sellers used a real estate broker when selling their home, while 87% of home buyers engaged a broker to assist in the buying process.[3]

33.     In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells.

34.     The seller broker's compensation is set forth in the listing agreement, which is a contract between the seller and his/her/their broker and includes the terms of the listing—for example, how long the broker retains the exclusive right to market the property, the listing price, etc.

35.     Due to the Buyer Broker Commission Rule, the listing agreement will also specify the total commission to be paid to the seller broker and also details the amount to be paid to the buyer broker.

---

[3] *See* https://www.nar.realtor/sites/default/files/documents/2022-home-buyers-and-sellers-generational-trends-03-23-2022.pdf

4879-6049-2181 v3

36.     Notably, until sometime in 2021, West Penn MLS's standard exclusive listing contract—the type of agreement used in most listings submitted to West Penn MLS—did not inform the seller of the amount to be paid to the buyer's broker, only the total commission in the event of a sale.

37.     When a buyer retains a broker, the buyer often enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

38.     If the buyer has a broker, the seller pays the buyer broker a commission. In fact, until only very recently, a standard of conduct in NAR's Code of Ethics long permitted and encouraged buyer brokers to inform their clients that their services were being provided free of charge—an obviously false statement, both because the seller pays the buyer broker's commission and because, by inflating total commissions, the Buyer Broker Commission Rule also exerts upward pressure on overall home prices.

39.     In any event, the Buyer Broker Commission Rule encourages buyers to use the services of a broker regardless of whether they feel that they need one, as there is no financial benefit to the buyer to not using a broker.

40.     The result of these agreements and the Buyer Broker Commission Rule is that buyer brokers—who are supposed to assist their clients in negotiating against the seller—receive their compensation from the total commission paid by the seller, not from the buyer they represent.

41.     Without the Buyer Broker Commission Rule, sellers would have no incentive to pay a commission to a buyer broker (who, after all, does not represent the seller's interests), and instead the buyer would pay his/her/their broker. Accordingly, the seller would only pay a commission to his/her/their own broker.

42.     The seller's total broker commission would thus be approximately half (or less) than the amount that sellers have been forced to pay as total commission to compensate both brokers in the transaction.

**West Penn MLS**

43.     Multiple listing services are cooperative ventures through which real estate brokers serving a common geographical area submit listings to a central hub which, in turn, distributes the information to every other member or subscriber of the service.

44.     West Penn MLS is such an entity. Furthermore, all of the Broker Defendants and their co-conspirator brokerages are West Penn MLS subscribers.

45.     West Penn MLS is virtually the only MLS operating in the Service Area in general and is the only MLS servicing the Pittsburgh metropolitan region.

46.     West Penn MLS is controlled by its subscribers (which include the Broker Defendants and their co-conspirator brokers and agents), whose officers and/or employees comprise its board of directors.

47.     In exchange for the payment of dues, West Penn MLS provides the Broker Defendants and its other broker subscribers with access to an electronic database of supply, pricing, and property-characteristics information relating to past and current real-estate listings in the Service Area.

48.     Importantly, included in the information disseminated to and shared among West Penn MLS's subscribers is the amount of commission offered to brokers representing potential buyers of listed properties.

49.     To build and maintain this database, West Penn MLS's rules require its subscribers to list all residential properties placed with them within the West Penn MLS Service Area:

"All properties/rentals listed with the [West Penn MLS] are Exclusive to [West Penn MLS]. Every Subscriber shall place for listing with [West Penn MLS] ALL of the following types or categories of listings obtained or received by said Subscriber with[in] the MLS coverage area. No listing may be placed with [West Penn MLS] by anyone other than a Subscriber of [West Penn MLS]."

50.     Non-subscribers cannot list properties with West Penn MLS and, furthermore, non-subscribers do not have access to the West Penn MLS database.

51.     West Penn MLS's Rules provide that West Penn MLS may terminate its services "to any Broker, Associate Broker, Sales Associate, Certified Appraiser, or Sales Associate Director who, in the opinion of [West Penn MLS], does not conform to the professional standards established by the National Association of REALTORS and the Rules and Regulations of" West Penn MLS.

52.     Furthermore, West Penn MLS's Rules provide that "[f]ines will be imposed to the Listing Agent for incomplete listing data in the West Penn system" for certain "missing or incorrect features," including failing to list the amount of commission (including zero) that the buyer's agent will receive from the sale of the listed property.

53.     West Penn MLS's "Standard Exclusive Listing Contract" during the relevant period includes a term stating "Owner further authorizes Listing Broker to offer compensation to subagents, Buyer-Agents and Transactional Licensees including the sharing of part of Listing Broker's Commission."

54.     West Penn MLS's standard listing agreement goes on to provide that,

COOPERATION WITH OTHER BROKERS – Licensee(s) has explained Broker's company policies about cooperating with other brokers. Broker and Seller agree that Broker will pay from Broker's fee a fee to another Broker who procures the Buyer, is a member of a Multiple Listing Service (MLS), and who: … (B) Represents the Buyer (BUYER'S AGENT). Broker will pay _____ of/from the sale price. A Buyer's Agent, even if compensated by Broker for Seller, will represent the interests of the Buyer.

55.     The Pennsylvania Association of Realtors (a state-level affiliate of NAR) also publishes a standard listing agreement—which just happens to be the only other form of listing agreement approved by West Penn MLS for use by its subscribers—that includes identical terms to those described in paragraphs 50-51.

56.     West Penn MLS has a history of implementing rules that have anticompetitive effects. For example, in 2009, West Penn MLS settled charges—via consent order—brought against it by the Federal Trade Commission for rules that effectively barred brokers who offered "unbundled," flat-rate, or otherwise innovative service packages from becoming subscribers.

**Buyer Broker Commission Rule**

57.     The rules and standard listing agreement terms detailed above and adopted and implemented by West Penn MLS, the Broker Defendants, and their co-conspirators, flow directly from rules and policies promulgated by NAR.

58.     As noted above, NAR's rules and policies have already been found to violate the federal antitrust laws.

59.     NAR's Handbook on Multiple Listing Policy mandates that "[i]n filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants."[4]

60.     The Handbook further states that "[m]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

---

[4] *See* Section G.1, https://www.nar.realtor/sites/default/files/documents/2019-HMLP.pdf

61.     The Buyer Broker Commission Rule therefore shifts a cost to the seller that would otherwise be paid by the buyer in a competitive market. As *The Wall Street Journal* opined, the result is that home sellers are effectively required to hire a buyer broker if they wish to list their home on an MLS, which requires the services of a seller broker, and that this system is a violation of "the Sherman Anti-Trust Act that keeps buying agents paid though they offer almost no useful services."[5]

62.     All policies that are retained unchanged, and all modified or revised or new policies, are then set forth by NAR in new editions of the Handbook that tend to be issued annually.

63.     The rules and required standard listing agreement provisions promulgated by West Penn MLS, and accepted, adopted, and implemented by the Broker Defendants and their co-conspirators, are directly modeled on NAR's rules and policies.

64.     In revising and re-issuing the Handbook, NAR has invited each Defendant and other co-conspirators to participate in the following agreement, combination, and conspiracy: They can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only upon the condition that they agree to adhere to and enforce the anticompetitive restraints set forth in the Handbook.

65.     West Penn MLS and the Broker Defendants, along with their co-conspirators in the western Pennsylvania region, have furthered and participated in this agreement, combination, and conspiracy by adopting, implementing, and enforcing rules and policies modeled on those issued by NAR.

66.     Thus, to the extent any Defendant argues that it was not involved in the initial drafting or adoption of NAR's Buyer Broker Commission Rule, that argument lacks legal significance

---

[5] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

because each Defendant has joined the conspiracy and agreed to abide by, implement, and enforce the Buyer Broker Commission Rule within the West Penn MLS Service Area.

67.     Similarly, although access to an MLS is of great significance to a broker in maintaining its business—without such access, a broker would face enormous disadvantages in marketing properties its clients are trying to sell or finding properties its clients would be interested in buying—any argument that Defendants had no choice but to adopt NAR's rules is likewise legally insignificant.

68.     As noted above, West Penn MLS is directed and controlled by a board of directors comprised of the principals, officers, and/or employees of the Broker Defendants and their co-conspirators. Furthermore, as noted above, virtually all of the real estate brokers in the western Pennsylvania region are members of West Penn MLS—thereby giving West Penn MLS a virtual monopoly in that geographic region.

69.     Thus, Defendants could, at any time, have chosen to shed the anticompetitive Buyer Broker Commission Rule without any meaningful threat to their position in the market.

70.     Instead, Defendants have maintained the Buyer Broker Commissions Rule (and related rules and policies) in order to stabilize commissions at an inflated level and to prevent competition--in the form of different (and lower) commission structures and service models—from driving down commission levels.

**Effects of the Buyer Broker Commission Rule**

71.     Defendants' conspiracy has had the following anticompetitive effects throughout the Service Area:

a.  Home sellers have been forced to pay commissions to buyer broker—who represent their adversaries in negotiations to sell their homes—thereby substantially inflating the cost of selling their homes.

b.  Home sellers have been compelled to set a high buyer broker commission to induce buyer brokers to show their homes to the buyer brokers' clients.

c.  Home sellers have paid inflated buyer broker commissions and inflated total commissions.

d.  The retention of a buyer broker has been severed from the setting of the broker's commission; the home buyer retains the buyer broker, while the home seller's agent actually sets the buyer broker's compensation.

e.  Price competition among brokers to be retained by home buyers has been restrained, as has price competition among brokers seeking to be retained to sell homes.

f.  Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer broker commission.

g.  The Broker Defendants have increased their profits substantially by receiving inflated buyer broker commissions and inflated total commissions.

72.  There are no pro-competitive effects of Defendants' conspiracy, which is plainly anticompetitive and injurious to competition.

73.     Even if any alleged pro-competitive effects exist, they are substantially outweighed by the conspiracy's anticompetitive effects.

74.     Substantial economic evidence supports the view that Defendants' conspiracy has resulted in inflated total commissions and inflated buyer broker commissions paid by home sellers, at levels far above what a competitive market would produce.

75.     Compared to other countries with competitive markets for residential real estate brokerage services, the commissions in the United States are substantially higher. Economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States.[6] They found:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[7]

76.     Delcoure and Miller also found variation within countries. For example, in the UK, they found that "1%-2% is typical" for total broker commissions, but that in "very competitive areas" the total rates ranged between "0.5-0.75%" whereas in lower priced areas the range was "as high as 3.5%."[8] Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[9]

77.     In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the seller broker and buyer broker) in most areas of the United States average between 5% and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and

---

[6] *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).
[7] *Id*. at 14.
[8] *Id.* at 17
[9] *Id.* at 13

3%. These numbers have remained stable despite both rising home prices (which leads to larger commission amounts) and the decreasing role of the buyer broker in an age when many prospective home buyers have already scoured the market using Zillow or other websites.

78.    Other economists have reached similar conclusions. A Professor of Economics from Cornell University has described the Buyer Broker Commission Rule — that is, the NAR requirement (adopted by West Penn MLS and the Broker Defendants) of having "the seller pay[] for the commission of both the listing [selling] agent and the cooperative [buyer's] agent" — as a "structural hurdle" that has prevented innovation and price competition in the real estate market.[10] This "hurdle" exists only because of Defendants' anticompetitive conspiracy and does not stem from any actual or unique structural aspect of real estate markets.

79.    Commissions paid in the western Pennsylvania region follow this national trend, with the typical commission paid by home sellers within the service area ranging anywhere from 5% to as high as 7%, with an average total commission of 5.53%.[11]

80.    In addition, the Buyer Broker Commission Rule encourages and facilitates anticompetitive steering away from brokers who deviate from the "standard" commission practices and rates. The Buyer Broker Commission Rule enables buyer brokers to identify and compare the buyer broker compensation offered by every seller and then steer their clients toward homes offering higher commissions.

---

[10] *See* FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

[11] *See* https://listwithclever.com/average-real-estate-commission-rate/pennsylvania/.

81.     This practice of steering, confirmed by economic literature, has manifest anticompetitive effects. Steering deters reductions from the "standard" commission and enables brokers to avoid doing business with, or to retaliate against, buyer brokers who try to compete by offering significant discounts.

82.     Indeed, although West Penn MLS's rules permit listing brokers to indicate zero dollars as the amount of commission to be paid to the buyer broker, the reality is that the steering effects of the Buyer Broker Commission Rule ensures that virtually no seller or listing broker will provide for a buyer broker commission that is significantly out of line with what is "typical" or "customary."

83.     This is because by requiring sellers to make a blanket, unilateral offer of compensation in advance of any offer being made on a listed property, the Buyer Broker Commission Rule enables brokers and agents (who all, as noted above, variously represent buyers and sellers) to discipline listing brokers who might stray from the norm by refusing to show their properties to prospective buyers or only showing them after showing properties advertising the expected commission.

84.     Thus, the option to list zero dollars as the buyer broker's commission is little more than a smokescreen, giving the appearance that actors in the market are free to negotiate and compete on price, when in fact they are not.

85.     The economic evidence is plain that the Buyer Broker Commission Rule works to restrain competition in several respects in real estate markets with the result being that home sellers pay far more than they would in a market not fettered by the Buyer Broker Commission Rule.

86.     Defendants' conspiracy and the Buyer Broker Commission Rule was designed to keep real estate commissions at elevated, supra-competitive levels, and Defendants have managed

to keep the standard commission at right around 6 percent for many years, despite significant changes in technology that should have substantially reduced commission charges.

## **CLASS ACTION ALLEGATIONS**

87.     Plaintiffs bring this action on behalf of themselves and on behalf of the members of a Class, pursuant to Federal Rule of Civil Procedure 23, defined as follows:

> All persons or entities who, from December 4, 2019, through the present used a listing agent or broker affiliated with or employed by one of the Broker Defendants in the sale of a home listed on the West Penn MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

88.     Excluded from the Class are Defendants, their officers, directors, and employees; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firm.

89.     The Class members are ascertainable as Defendants possess records relating to the residential real estate transactions at issue in this litigation.

90.     Data publicized by West Penn MLS indicates that nearly 2,000 units of residential real estate were sold in the Service Area in January 2020 alone.[12] As such, Plaintiffs reasonably believe that the Class is comprised of many thousands of individuals and is therefore so numerous as to make individual joinder of all Class members impracticable.

91.     Common questions of law and fact exist as to all members of the Class and predominate over questions that affect only individual Class members. These common questions of law and/or fact, include but are not limited to:

---

[12] *See* https://www.prnewswire.com/news-releases/residential-real-estate-begins-new-year-with-a-bang-301026645.html

     a.  Whether Defendants engaged in the alleged conspiracy;

     b.  Whether the conduct of Defendants' and their co-conspirators caused injury to the business or property of Plaintiffs and the Class members.

     c.  Whether Defendants' conspiracy caused the amount of total commissions and buyer broker commissions paid in the Service Area to be inflated;

     d.  Whether the competitive harm caused by the conspiracy substantially outweighs any competitive benefit;

     e.  Whether Plaintiffs and the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief;

     f.  Whether Defendants' conduct is unlawful; and

     g.  The appropriate class-wide measure of damages.

92.    Plaintiffs' claims are typical of the claims of the Class, as Plaintiffs' claims arise from the same course of conduct

93.    Plaintiffs have retained counsel with experience in antitrust litigation and the prosecution of class and/or collective actions. Together, Plaintiffs and their counsel will zealously prosecute this action for the benefit of the Class and will fairly and adequately protect the interests of the Class.

94.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by numerous individual members of the classes would impose undue burdens on Defendants and the judicial system and would create a risk of inconsistent adjudications of the questions of law and fact common to the

Class. The class action mechanism, on the other hand, can generate significant efficiencies of both time and expense and would ensure consistency.

## **ANTITRUST INJURY**

95.     Defendants' anticompetitive agreements and conduct have had the following effects, among others:

> h.   Sellers of residential property have been made to pay inflated costs to sell their homes because Defendants' rules and practices require them to pay commissions to buyer brokers;

> i.   Home sellers have been forced to set buyer broker commissions to induce buyer brokers to show the sellers' homes to prospective buyers;

> j.   Price competition has been restrained, both among buyers' brokers and among sellers' brokers; and

> k.   the Broker Defendants have inflated their profits through artificially increased total commissions and increased buyer broker commissions.

96.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their business or property, have paid higher total commissions than they would have paid in the absences of Defendants' anticompetitive conspiracy, and have suffered damages as a result.

97.     There are no pro-competitive effects of Defendants' conspiracy that are not substantially outweighed by the conspiracy's anticompetitive effects.

98.     Significant economic evidence supports concluding that Defendants' conspiracy has resulted in Plaintiffs and the Class paying buyer broker commissions and total commissions that have been inflated to a supra-competitive level.

99.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## COUNT I – VIOLATION OF 15 U.S.C. § 1

100.    Plaintiffs incorporate by reference each of the foregoing paragraphs as though set forth at length herein.

101.    Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

102.    The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the broker representing the purchaser of the seller's home.

103.    In furtherance of this contract, combination, or conspiracy West Penn MLS and the Broker Defendants, along with their co-conspirators, have committed one or more of the following overt acts:

> l.    Participating in the implementation, maintenance, and enforcement of the Buyer Broker Commission Rule and other anticompetitive rules by and among West Penn MLS subscribers and within the West Penn MLS Service Area; and

> m.    the Buyer Broker Defendants requiring and encouraging the individual brokers and agents they employ to implement the Buyer Broker Commission Rule and related anticompetitive policies.

104.    Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer broker commission and an inflated total commission, and it has restrained price competition

among buyer brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

105.    Defendants' conspiracy has caused buyer broker commissions and total commissions to be inflated. Plaintiffs and the other Class members paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

106.    Defendants' conspiracy is a *per se* violation of the Sherman Act, 15 U.S.C. § 1.

107.    Alternatively, Defendants' conspiracy violates 15 U.S.C. §1 under a rule-of-reason analysis.

108.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S. C. § 1, Plaintiffs and the other members of the Class have been injured in their business and property and suffered damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, requests that the Court grant judgment in their favor and against Defendants and awards them relief as follows:

a.   An order certifying a Class under Federal Rule of Civil Procedure 23 and appointing Plaintiffs and their counsel to represent the class;

b.   A declaration that Defendants' conduct, as set forth above, is unlawful;

23

c. A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from (1) requiring that sellers pay the buyer broker and (2) continuing to restrict competition among residential real estate brokers in the manner set forth above;

d. An award of treble damages and/or restitution to Plaintiffs and the Class in an amount to be determined at trial;

e. An award of pre- and post-judgment interest to Plaintiffs;

f. An award to Plaintiffs of the costs of this lawsuit, including reasonable attorneys' fees and expenses; and

g. Any other relief the Court deems just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury on all issues so triable.

Dated: December 4, 2023                    Respectfully Submitted,

                                                   /s/ *Bruce C. Fox*
                                                   Bruce C. Fox (PA 42576)
                                                   Hugh T. McKeegan (PA 325673)
                                                   OBERMAYER REBMANN
                                                   MAXWELL & HIPPEL LLP
                                                   525 William Penn Place, Suite 1710
                                                   Pittsburgh, PA 15219
                                                   (412) 566-1500 (Phone)
                                                   (412) 281-1530 (Fax)
                                                   bruce.fox@obermayer.com
                                                   hugh.mckeegan@obermayer.com