# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIELLE and JESSIE KAY; JOHN and NANCY MORATIS; KAITLYN SLAVIC; and MARIA IANNOME,<br><br>               Plaintiffs,<br><br>v.<br><br>WEST PENN MULTI-LIST, INC; EVEREST CONSULTING GROUP LP (d/b/a Berkshire Hathaway HomeServices The Preferred Realty); HOWARD HANNA COMPANY (d/b/a Howard Hanna); REEDSTONE, INC. (f/k/a Pirain Enterprises, Inc.) (d/b/a NextHome PPM Realty); MHDM LLC (d/b/a Realty ONE Group Gold Standard); SF, LLC (d/b/a Realty ONE Group Platinum); REALTY ONE GROUP HORIZON, LLC; RIVER POINT REALTY, LLC; BOVARD-ANDERSON CO.; and PRIORITY REALTY, LLC,<br><br>               Defendants. | Civil Action No: 2:23-cv-02061<br><br>Judge William S. Stickman IV |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION BY WEST PENN MULTI-LIST, INC., EVEREST CONSULTING GROUP LP, AND HOWARD HANNA COMPANY TO DISMISS THE SECOND AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

LEGAL STANDARD ......................................................................................... 6

ARGUMENT ...................................................................................................... 6

    I.    Plaintiffs' Antitrust Claim Must Be Dismissed ......................................... 6

        A.    Plaintiffs Lack Standing To Pursue Antitrust Damages Because They Were Indirect Purchasers ......................................................... 6

        B.    Plaintiffs Do Not Plausibly Allege An Agreement And Thus Fails To State An Antitrust Claim Under Either The Rule of Reason Or The *Per Se* Rule ....................................................................................... 8

            1.    Plaintiffs' Conclusory "Group Pleading" Allegations Are Inadequate ................................................................................. 9

            2.    Defendants' Alleged Participation in WPML Does Not Establish An Agreement To Fix Commissions ............................. 10

                a.    The Rule does not require listings to offer any commission ............................................................... 10

                b.    Plaintiffs do not allege any other agreement between WPML and brokerages ....................................... 11

                c.    Mere participation in a membership organization is not anticompetitive ................................................ 12

                d.    Plaintiffs do not allege any other agreement among the brokerages .................................................... 14

        C.    The Rule Of Reason Applies To Plaintiffs' Antitrust Claim And Plaintiffs Fail To State A Claim Under The Rule Of Reason Because They Do Not Allege A Plausible Market ........................... 15

            1.    The Rule Of Reason Applies Because Plaintiffs Have Not Adequately Alleged A *Per Se* Violation ...................................... 16

                a.    The type of agreement alleged is generally subject to rule-of-reason analysis ................................... 16

                b.    The WPML guidelines do not have obviously anticompetitive effects ..................................... 17

                c.    The WPML guidelines have facially plausible procompetitive benefits ..................................... 20

             2.    The Complaint Fails To State A Claim Under The Rule Of Reason Because Plaintiffs Have Not Pleaded A Plausible Relevant Market ................................................................... 23

    II.    Plaintiffs' CPL Claim Must Be Dismissed ........................................... 25

i

A.    The Complaint Fails To State A Claim Under The CPL ...........................26

    1.    The Complaint Does Not Plausibly Allege That Defendants Engaged In Deceptive Conduct .....................................................26

    2.    The Complaint Does Not Plausibly Allege Justifiable Reliance..........................................................................................28

B.    Plaintiffs Have No Private Right Of Action Under The CPL....................29

    1.    Plaintiffs Do Not Allege That They Purchased Buyer-Broker Services From Any Defendant......................................................29

    2.    Plaintiffs Do Not Allege Any Commercial Relationship With WPML Or Howard Hanna ..........................................................30

CONCLUSION ...................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Alvord-Polk, Inc. v. F. Schumacher & Co.,
37 F.3d 996 (3d Cir. 1994).................................................................13

Ashcroft v. Iqbal,
556 U.S. 662 (2009)..............................................................6, 27

California v. ARC American Corp.,
490 U.S. 93 (1989).................................................................7

Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007)........................................................8, 9, 14, 18

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,
441 U.S. 1 (1979)................................................................20, 22

Buck v. Hampton Township School District,
452 F.3d 256 (3d Cir. 2006)..........................................................3, 4

Burtch v. Milberg Factors, Inc.,
662 F.3d 212 (3d Cir. 2011).......................................................8, 15, 23

Connelly v. Lane Construction Corp.,
809 F.3d 780 (3d Cir. 2016)............................................................6

Connelly v. Steel Valley School District,
706 F.3d 209 (3d Cir. 2013).........................................................6, 30

Consolidated Metal Products, Inc. v. American Petroleum Institute,
846 F.2d 284 (5th Cir. 1988) .......................................................12, 13

Corsale v. Sperian Energy Corp.,
412 F. Supp. 3d 556 (W.D. Pa. 2019)...................................................28

Doherty v. Allstate Indemnity Co.,
2016 WL 5390638 (E.D. Pa. Sept. 27, 2016) ........................................27, 28

Duffy v. Lawyers Title Insurance Co.,
972 F. Supp. 2d 683 (E.D. Pa. 2013) ..................................................30

Ethypharm S.A. France v. Abbott Laboratories,
707 F.3d 223 (3d Cir. 2013)............................................................6

*Finkelman v. National Football League*,
810 F.3d 187 (3d Cir. 2016)...........................................................................6

*FTC v. Indiana Federation of Dentists*,
476 U.S. 447 (1986)........................................................................................20

*Garrett v. Wexford Health*,
938 F.3d 69 (3d Cir. 2019).............................................................................27

*Gemini Physical Therapy & Rehabilitation, Inc. v. State Farm Mutual Automobile
Insurance Co.*, 40 F.3d 63 (3d Cir. 1994)......................................................29

*Grace v. RE/MAX Holdings, Inc.*,
2024 WL 2761188 (N.D. Cal. May 29, 2024)........................................1, 10, 11

*Gregg v. Ameriprise Financial, Inc.*,
664 Pa. 567 (2021)....................................................................................26, 28

*Halpern v. Ricoh U.S.A., Inc.*,
299 A.3d 1023 (Pa. Super. Ct. 2023)..............................................................28

*Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237 (3d Cir. 2010)............................................................................15

*Hunt v. United States Tobacco Co.*,
538 F.3d 217 (3d Cir. 2008)..............................................................26, 28, 29

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)......................................................................................2, 7

*In re Diisocyanates Antitrust Litigation*,
2020 WL 1140244 (W.D. Pa. Mar. 9, 2020) .....................................................9

*In re EpiPen Direct Purchaser Litigation*,
2022 WL 1017770 (D. Minn. Apr. 5, 2022)......................................................15

*In re Insurance Brokerage Antitrust Litigation*,
618 F.3d 300 (3d Cir. 2010).....................................................................13, 14

*In re Processed Egg Products Antitrust Litigation*,
821 F. Supp. 2d 709 (E.D. Pa. 2011) ................................................................9

*In re Rutter's Inc. Data Security Breach Litigation*,
511 F. Supp. 3d 514 (M.D. Pa. 2021)...............................................................29

*In re Sulfuric Acid Antitrust Litigation*,
703 F.3d 1004 (7th Cir. 2012) ........................................................................20

*Kansas v. UtiliCorp United, Inc.*,
    497 U.S. 199 (1990)................................................................................................7

*Katz v. Aetna Casualty & Surety Co.*,
    972 F.2d 53 (3d Cir. 1992).....................................................................................30

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ...............................................................................14

*Kotteakos v. United States*,
    328 U.S. 750 (1946)...............................................................................................15

*Landau v. Viridian Energy PA LLC*,
    223 F. Supp. 3d 401 (E.D. Pa. 2016) .....................................................................27

*Latuska v. Sethuraman*,
    2016 WL 4082738 (W.D. Pa. July 29, 2016) .........................................................30

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)...............................................................................................16

*Lifewatch Services Inc. v. Highmark Inc.*,
    902 F.3d 323 (3d Cir. 2018)...................................................................................23

*Loduca v. WellPet LLC*,
    549 F. Supp. 3d 391 (E.D. Pa. 2021) .....................................................................26

*Murphy v. Alpha Realty, Inc.*,
    1978 WL 1451 (N.D. Ill. Dec. 7, 1978)..................................................................22

*NCAA v. Alston*,
    594 U.S. 69 (2021).................................................................................................16

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018)..........................................................................................24, 25

*O'Riordan v. Long Island Board of Realtors, Inc.*,
    707 F. Supp. 111 (E.D.N.Y. 1998) ........................................................................21

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008).....................................................................................6

*Realcomp II, Ltd. v. FTC*,
    635 F.3d 815 (6th Cir. 2011) .................................................................................24

*Reifert v. South Central Wisconsin MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) .................................................................................21

*Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n*,
    666 F.2d 1130 (8th Cir. 1981) ........................................................................17

*Satnam Distributors LLC v. Commonwealth-Altadis, Inc.*,
    140 F. Supp. 3d 405 (E.D. Pa. 2015) ............................................................23

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ........................................................................14

*Supermarket of Homes, Inc. v. San Fernando Valley Board of Realtors*,
    1983 WL 2199 (C.D. Cal. Sept. 1, 1983) ....................................................22

*Target Corp. v. LCH Pavement Consultants, LLC*,
    2013 WL 2470148 (D. Minn. June 7, 2013)..................................................15

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)....................................................................................16, 17

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956).......................................................................................23

*United States v. Gillen*,
    599 F.2d 541 (3d Cir. 1979)..........................................................................17

*United States v. National Assocciation of Realtors*,
    2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) ..............................................20

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) ......................................................................20

*Venture Resources Group, Inc. v. Greater New Jersey Regional Multiple Listing*
    *Service, Inc.*, 1995 WL 866841 (D.N.J. Aug. 24, 1995)........................20, 21

*Vogel v. American Society of Appraisers*,
    744 F.2d 598 (7th Cir. 1984) ........................................................................20

*Walgreen Co. v. Johnson & Johnson*,
    950 F.3d 195 (3d Cir. 2020).............................................................................7

*Warren General Hospital v. Amgen Inc.*,
    643 F.3d 77 (3d Cir. 2011).............................................................................7

*Weinberg v. Sun Co.*,
    565 Pa. 612 (2001)........................................................................................28

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Coop.*,
    89 F.4th 430 (3d Cir. 2023) ....................................................................17, 20

**Docketed Cases**

*Batton v. Compass, Inc.*,
    No. 1:23-cv-15618 (N.D. Ill.) ................................................................25

**Statutes and Regulations**

73 Pa. Cons. Stat. § 201-2(4)(xxi) .........................................................26

73 Pa. Cons. Stat. § 201-9.2(a) ..............................................................29

D.C. Code Ann. § 42-1703(f) .................................................................22

Del. Code Ann. tit. 24, § 2930 ...............................................................21

Ill. Comp. Stat. 454/10-5 .......................................................................21

Md. Code Ann., Bus. Occ. & Prof. 17-534..............................................21

Minn. Stat. Ann. § 82.70.........................................................................21

N.J. Admin. Code 11:5-6.2 .....................................................................22

**Other Authorities**

Decision and Order, *In re West Penn Multi-List, Inc.*, No. C-4247 (Feb. 13, 2009),
    https://www.ftc.gov/sites/default/files/documents/cases/2009/02/090220westp
    enncmpt.pdf ........................................................................................19

Delcoure & Miller, *International Residential Real Estate Brokerage Fees and
    Implications for the US Brokerage Industry*, 5 Int'l Real Est. Rev. 12 (2002)............5

Evans, *The Antitrust Economics of Multi-Sided Platform Markets*, 20 Yale J. on
    Reg. 325 (2003) ..................................................................................24

Rochet & Tirole, *Two-Sided Markets: A Progress Report*, 37 Rand J. Econ. 645
    (2006)....................................................................................................24

Ryan & Friedland, *When You Buy or Sell a Home, Realty Bites*, Wall St. J. (Mar.
    3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-
    11551649734 .........................................................................................5

Swanepoel T3 Group, *D.A.N.G.E.R. Report*,
    https://www.gcar.net/images/uploads/subpage/NAR_Danger_Report_Part_1_
    of_2.pdf....................................................................................................5

*What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop*, Segment 1 Tr. (June 5, 2018), https://www.ftc.gov/system/files/documents/public_events/1361534/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_1.pdf .................................................................................................................3

*What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop*, Segment 3 Tr. (June 5, 2018), https://www.ftc.gov/system/files/documents/public_events/1361534/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf .................................................................................................................3

WPML Rules and Regulations, https://www.westpennmls.com/wp-content/uploads/RR-Cover-Page-TOC-2-23-2022.pdf (effective Nov. 3, 2023)

§ 3.21(J) ...............................................................................................4, 18, 27

§ 3.5 ...............................................................................................................19

§ 10.1(B)(4).....................................................................................................18

**INTRODUCTION**

Plaintiffs seek to piggyback on lawsuits challenging a rule applying to buyer-broker commissions adopted by the National Association of Realtors (NAR) and its affiliated Multiple Listing Services (MLSs). But West Penn Multi-List (WPML) is an independent MLS with no NAR affiliation and its own distinct rules, including a totally different rule governing buyer-broker commissions. Whereas the NAR rule requires home listings on NAR MLSs to include blanket offers of compensation to buyer brokers, WPML does not require listings to offer any buyer-broker commission at all and expressly permits negotiation. As Plaintiffs allege, WPML's rule makes clear that some listings "do not offer compensation to the Buyer's Agent" and that listings should "indicat[e] $0.00 if no compensation is being offered." Second Am. Compl. ¶ 62 (Compl.). This fundamental misalignment between Plaintiffs' theory and the acknowledged realities of WPML dooms their would-be copycat claims as a matter of law. Indeed, another court recently dismissed a complaint against an independent MLS precisely because the challenged rule—just like WPML's rule—allows offers of $0 compensation and thus does not require "a blanket, unilateral contractual offer of compensation" as alleged. *Grace v. RE/MAX Holdings, Inc.*, 2024 WL 2761188, at *3 (N.D. Cal. May 29, 2024).

Here, as in *Grace*, Plaintiffs largely copy and paste the allegations from other complaints, cast a provision of WPML's rules as a "local version" of the NAR rules, Compl. ¶ 11, and proceed to make all the same arguments as Plaintiffs in the NAR cases (while filing serial objections to the settlements that counsel in those cases have reached). That does not work. Plaintiffs do not have any viable allegations against *these defendants* or *this rule*. Simply put, "there is a disconnect between Plaintiff[s'] characterization of the rules and what they actually say." *Grace*, 2024 WL 2761188, at *3. Plaintiffs' claim here fails for at least four reasons:

*First*, Plaintiffs' antitrust claim must be dismissed because they lack antitrust standing.

The Supreme Court has limited plaintiffs who may bring antitrust claims to those who directly purchase the goods and services at issue. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). These Plaintiffs are home *sellers* who are at best only indirect purchasers of buyer-broker services. The seller-broker, not the seller, pays the disputed buyer-broker commission. Accordingly, the case must be dismissed.

*Second*, Plaintiffs fail to plausibly allege an illegal agreement among WPML, Everest Consulting Group, and Howard Hanna Company (collectively, the "Defendants"). They do not allege any agreement at all because their impermissible group pleading fails to tie any particular defendant to the adoption and implementation of the challenged WPML rule. But in any event, that rule is not an unlawful agreement to fix buyer-broker commissions because it does not require listings to offer buyer brokers any commission at all and permits negotiation of commissions. Plaintiffs allege no other agreement or facts that could support an agreement between any of the defendants to fix commissions.

*Third*, even if Plaintiffs did plausibly allege an agreement, their antitrust claim would still fail because it fails to state a claim under the rule of reason. The challenged conduct must be evaluated under the rule of reason mode of antitrust analysis because Plaintiffs have not plausibly alleged that the challenged WPML rule is so obviously anticompetitive that the Court can condemn it as *per se* unlawful. And Plaintiffs fail to state a claim under the rule of reason because they have not alleged a plausible product market.

*Fourth*, Plaintiffs' claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (CPL) must be dismissed because Plaintiffs fail to plausibly allege facts to support multiple elements of their claim. The complaint does not identify *any* representation made to Plaintiffs by *any* Defendant, without which there can be no deceptive conduct by

Defendants or justifiable reliance by Plaintiffs.  And the CPL's private right of action does not extend to Plaintiffs because they did not purchase the service at issue—buyer-broker services— from any Defendant.  Plaintiffs also do not allege that they had any commercial dealings at all with the Defendants other than Everest Consulting Group (d/b/a Berkshire Hathaway HomeServices The Preferred Realty) (Berkshire Hathaway), which independently defeats their CPL claims against the other Defendants.

## BACKGROUND

A home "is often the most complex purchase of any person's life."[1]  Individuals therefore rely on brokers, who "play an important role in the residential real estate market, facilitating transactions by marketing properties listed for sale, helping buyers find properties, assisting with negotiations, and the like."  Compl. ¶ 38.  Even though prospective buyers can find homes of interest themselves using "readily accessible, public-facing websites," like "Zillow," *id.* ¶¶ 10, 87, they still choose to use brokers:  "[I]n 2022, about 90% of sellers used a real estate broker when selling their home while 87% of home buyers engaged a broker."  *Id.* ¶ 40.  This is because buyer brokers provide a range of services, including identifying problems with prospective homes and helping buyers who receive low appraisals obtain financing.[2]

Brokers use Multiple Listing Services to list homes for sellers and to find homes for buyers.  MLSs are "cooperative ventures" that allow "real estate brokers serving a common geographical area" to share listings with other MLS subscribers.  Compl. ¶ 51.  MLSs are

---

[1] *What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop*, Segment 3 Tr. (June 5, 2018) at 3, https://www.ftc.gov/system/files/documents/public_events/1361534/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf (cited at Compl. ¶¶ 8, 88).  The court can consider this transcript and other materials that are cited in the complaint and thus "incorporated by reference."  *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).
[2] *What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop*, Segment 1 Tr. (June 5, 2018) at 26, https://www.ftc.gov/system/files/documents/public_events/1361534/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_1.pdf.

"critical conduits for listing data content," "mak[ing] a more liquid market for real estate [and] decreas[ing] search costs for consumers."[3]

Defendant WPML is an MLS serving the Pittsburgh metropolitan region.  Compl. ¶¶ 51-52, 54.  Berkshire Hathaway and Howard Hanna are "real estate brokerages operating in western Pennsylvania," who "subscribe[] to West Penn MLS" (the "Brokerage Defendants").  *Id.* ¶¶ 1, 34.  Although many MLSs affiliate with NAR, WPML does not.  WPML has its own "Rules and Regulations," *id.* ¶ 60, which differ from NAR's rules.  Most importantly, WPML's rules state that "broker commissions are subject to negotiation between the seller and [l]isting [b]roker," and a listing broker may offer "no compensation*." Id*. ¶¶ 62-63.  In addition, "Listing Broker[s] may modify the [commission] offered to other Brokers without notifying" WPML, in part because "WPML plays no role in such negotiations."  WPML Rules and Regulations § 3.21(J).[4]

Plaintiffs' brokers listed homes for sale on WPML using Berkshire Hathaway and Realty ONE Group Gold Standard.  Compl. ¶¶ 19-22.  The complaint does not allege any Defendant served as a buyer broker.  The complaint does not (and cannot) allege that Plaintiffs purchased anything from WPML or had any relationship with WPML whatsoever.  Notwithstanding their allegations of fixed commission rates, *id.* ¶¶ 5, 80, 128, the Plaintiffs themselves paid different commission rates:  The Kays paid 5% (with 3% "earmarked" for the buyer broker), the Moratises paid 7% (with 3.5% "earmarked" for the buyer broker), Slavic paid 5% (with 2.5% "earmarked" for the buyer broker), and Iannome paid 6%, *see id.* ¶¶ 19-22.  In practice, consumers have

---

[3] *What's New in Residential Real Estate Brokerage Competition*, Segment 3 Tr., *supra* n.2, at 5.
[4] The complaint references WPML's Rules and Regulations, Compl. ¶ 59, and thus incorporates them by reference, *Buck*, 452 F.3d at 260.  WPML's Rules and Regulations are available at https://www.westpennmls.com/wp-content/uploads/RR-Cover-Page-TOC-2-23-2022.pdf (effective Nov. 3, 2023).

access to a variety of "pricing models," including lower rates, flat fees, and transaction-based fees.[5]

The complaint devotes considerable attention to other rules not at issue and other cases that challenge those not-at-issue rules. *First*, the complaint alleges that a jury found that a distinct NAR rule governing buyer-broker commissions "violated federal antitrust law." Compl. ¶¶ 3, 11. WPML has not implemented that rule, so it is not at issue. *Id.* ¶ 60. Unlike WPML's Commission Disclosure Rule, NAR's rule does not permit listings to offer no compensation. *See id.* ¶ 72. *Second*, the complaint contains allegations about WPML's fifteen-year-old settlement with the Federal Trade Commission, in which WPML agreed to not enforce rules barring "innovative discount service packages" from its platform. *Id.* ¶ 68. Plaintiffs do not explain how this agreement *not* to stifle "innovative … service[s]" supports allegations that Defendants continue "to inhibit price competition" today. *Id.* ¶¶ 68-69.

Plaintiffs allege, without supporting detail, that because of the Commission Disclosure Rule, home sellers have paid commissions to buyer brokers "that would otherwise be paid by the buyer in a competitive market." Compl. ¶ 73. Plaintiffs do not allege how, in an age where brokers do "not monopolize the flow of housing information"[6] because consumers have "so much real estate information and so many apps at their fingertips,"[7] buyer brokers can steer buyers away from homes they previously selected.

---

[5] Swanepoel T3 Group, *D.A.N.G.E.R. Report*, at 24, 53, https://www.gcar.net/images/uploads/subpage/NAR_Danger_Report_Part_1_of_2.pdf (cited at Compl. ¶ 59); *see also* Delcoure & Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry,* 5 Int'l Real Est. Rev. 12, 17 (2002) ("[S]ome real estate agents charged flat fees that ran from 2 to 4 percent.") (cited at Compl. ¶¶ 85-86).
[6] Ryan & Friedland, *When You Buy or Sell a Home, Realty Bites*, Wall St. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734 (cited at ¶ 73).
[7] Swanepoel Group*, supra* note 5, at 59.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "need not accept as true unsupported conclusions and unwarranted inferences." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 202 (3d Cir. 2016) (citation omitted). Dismissal with prejudice is appropriate where further "'amendment would be inequitable or futile.'" *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 217 (3d Cir. 2013) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008)).

## ARGUMENT

Plaintiffs' antitrust claim should be dismissed because Plaintiffs lack antitrust standing, have failed to plausibly allege an agreement, and have failed to properly allege an antitrust market that was harmed by any purported agreement. Plaintiffs' claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law must be dismissed because Plaintiffs have failed to plausibly allege that Defendants engaged in deceptive conduct or that Plaintiffs justifiably relied on any such conduct, and Plaintiffs lack a private right of action under the law.

## I.     Plaintiffs' Antitrust Claim Must Be Dismissed

### A.     Plaintiffs Lack Standing To Pursue Antitrust Damages Because They Were Indirect Purchasers

Plaintiffs lack antitrust standing because they were indirect purchasers of buyer-brokers' services. To pursue a federal antitrust claim, plaintiffs must have "antitrust standing"—which requires, among other things, that plaintiffs suffer an "antitrust injury" as a result of defendants' conduct. *Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223, 232-233 (3d Cir. 2013).

The Supreme Court has held that only a "direct purchaser" has antitrust standing, whereas

"indirect purchasers" generally lack antitrust standing to sue for damages. *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (applying *Illinois Brick*, 431 U.S. at 729). That means that only the "overcharged direct purchaser, and not others in the chain of manufacture or distribution" can sue for antitrust damages under Section 1 of the Sherman Act. *Illinois Brick*, 431 U.S. at 729. An indirect purchaser is one who is "not the immediate buyer[] from the alleged antitrust violator[]," *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990), or who does not purchase the relevant product or service "directly from the [antitrust] defendants," *California v. ARC Am. Corp.*, 490 U.S. 93, 97 (1989).

Plaintiffs, home sellers, do not directly purchase buyer-brokers' services; their selling agents do so. Compl. ¶ 44. As alleged, sellers generally enter into a contract with the listing broker (or seller-broker), which sets forth the seller-broker's compensation. *Id.* ¶ 42. If the buyer has a broker, "the Listing Broker will pay the Buyer Broker a share of the total commission as set forth in the listing agreement." *Id.* ¶ 45. A buyer's contract with a broker "typically discloses that the Buyer Broker will be compensated by receiving a commission from the Listing Broker." *Id.* ¶ 44. Plaintiffs affirm this understanding in explaining that WPML's Commission Disclosure Rule requires the listing broker to "include and designate … the compensation being offered *by the Listing Broker* to the Seller [i.e., buyer] Broker." *Id.* ¶ 62 (emphasis added). Thus, as alleged, the seller-broker pays the buyer-broker commission.

Because a home seller is not a direct purchaser of the service with an allegedly fixed price, Plaintiffs lack antitrust standing to bring this suit. *See Walgreen Co. v. Johnson & Johnson*, 950 F.3d 195, 198 & n.3 (3d Cir. 2020).

**B.   Plaintiffs Do Not Plausibly Allege An Agreement And Thus Fails To State An Antitrust Claim Under Either The Rule of Reason Or The *Per Se* Rule**

Plaintiffs have not plausibly alleged that the conduct that forms the basis of their antitrust claim was the product of any agreement among Defendants.  Rather, Plaintiffs' complaint contains exactly what the Supreme Court said "will not suffice" for an antitrust claim:  "[A]n allegation of parallel conduct and a bare assertion of conspiracy."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  To plausibly allege an agreement, a complaint must include "enough factual matter (taken as true) to suggest that an agreement was made"—that is, facts that exclude the possibility that the purported conspirators acted independently.  *Id.*  And "a conclusory allegation of agreement at some unidentified point" does not suffice.  *Id.* at 557; *see id.* at 565 n.10 (explaining that the plaintiff's failure to allege a "specific time, place, or person involved in the alleged conspiracies" left "no clue as to which of the [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place").  Courts regularly dismiss complaints that lack sufficient factual allegations of an agreement.  *See, e.g.*, *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011).  The Court should do the same here.

Plaintiffs fail to allege an agreement "to require sellers of residential property to make inflated payments to the broker representing the purchaser of the seller's home," Compl. ¶ 131, for two reasons.  *First*, Plaintiffs engage in impermissible group pleading that lacks allegations tying any particular defendant to the so-called agreement.  *Second*, the conduct that Plaintiffs allege—following WPML's Commission Disclosure Rule—does not establish an agreement to fix commissions.  As Plaintiffs acknowledge, WPML's Commission Disclosure Rule expressly permits listing brokers to negotiate commissions and offer no buyer-broker compensation at all.  Plaintiffs do not allege any agreement to act at odds with the rule and cannot establish a

conspiracy based on mere participation in a trade association.  Nor do Plaintiffs allege any agreement at all among the brokerages.  At most, Plaintiffs allege only parallel conduct responding to shared economic incentives—which does not suffice under *Twombly*.

### 1.  Plaintiffs' Conclusory "Group Pleading" Allegations Are Inadequate

Plaintiffs cannot plead a multi-defendant antitrust conspiracy by lumping Defendants together.  Courts "look[] for more than mere repetitive generic reference to 'Defendants' tacked on to a conclusory verb form to connect an individual defendant to an actual agreement in an antitrust conspiracy." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011) (quoted in *In re Diisocyanates Antitrust Litig.*, 2020 WL 1140244, at *2 (W.D. Pa. Mar. 9, 2020)).  *Twombly* itself rejected vague group pleading, explaining "the complaint … furnishe[d] no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."  550 U.S. at 565 n.10.

The complaint does not—as it must—allege facts to support the contention that *each individual Defendant* entered into an agreement.  Instead, Plaintiffs make conclusory allegations as to all Defendants—that "each Broker Defendant has joined the conspiracy and agreed to abide by, implement, and enforce the Buyer Broker Commission Rule within the West Penn MLS Service Area." Compl. ¶ 76.[8]  Indeed, apart from the pro forma paragraphs in which Plaintiffs identify each Defendant by name, *id.* ¶¶ 23-34, the complaint contains *only* generic allegations about "Defendants" as a group, *see e.g.*, *id.* ¶ 80 ("Defendants have maintained the Buyer Broker Commission Rule (and related rules and policies) in order to stabilize commissions at an inflated level.").  That is sufficient basis to conclude that the complaint fails to allege an agreement.

---

[8] Plaintiffs refer to WPML's Commission Disclosure Rule as the "Buyer Broker Commission Rule."

### 2. Defendants' Alleged Participation in WPML Does Not Establish An Agreement To Fix Commissions

Setting that threshold pleading defect aside, Plaintiffs fail to plausibly allege an agreement to inflate buyer-broker commissions.

### a. The Rule does not require listings to offer any commission

As Plaintiffs concede, WPML's Commission Disclosure Rule expressly permits negotiation of buyer-broker commissions and does not require listings to offer any buyer-broker commission at all. *See* Compl. ¶¶ 62-63. It is thus implausible that Defendants' alleged adherence to this rule constitutes an agreement to set commission rates. After all, brokerages and brokers can follow the rule by setting whatever commission they like (including zero). Although Plaintiffs—in mimicking lawsuits challenging the NAR rule—attempt to import arguments made about NAR rules to an MLS that is independent from NAR, they recognize that WPML's rule, unlike the NAR rule, specifically contemplates that some listings "do not offer compensation to the Buyer's Agent" and states that listings should "indicat[e] $0.00 if no compensation is being offered." *Id.* ¶ 62. The rule challenged here is thus purely informational, akin to a requirement that a job listing specify the salary being offered—even if it is an unpaid internship, it is not, even as alleged, an agreement to fix any price.

Indeed, another district court recently dismissed a complaint challenging a similar rule of an independent MLS for this exact reason—explaining that "[i]f it is possible to offer zero dollars, then such an offer is definitionally not required," which "belies the allegation that 'a blanket, unilateral contractual offer of compensation' is mandated by the operation of the Rule itself." *Grace*, 2024 WL 2761188, at *3. Here, as in *Grace*, "Plaintiff[s] ha[ve] not plausibly alleged that the allegedly anticompetitive arrangement flows from the language" of the challenged rule—both [r]ules simply do not on their face require the results Plaintiff[s] allege[]

they do." *Id.* at *4.

### b. Plaintiffs do not allege any other agreement between WPML and brokerages

Apart from WPML's Commission Disclosure Rule rule—which does not establish an agreement to fix commissions—Plaintiffs do not allege any separate agreement between WPML and the other Defendants or among the Broker Defendants. Plaintiffs' theory instead seems to be that although the Commission Disclosure Rule is facially permissible, brokers in "reality" thwart the rule through steering or by "disciplin[ing]" fellow brokers who offer lower commissions. Compl. ¶¶ 93-94. Yet the complaint contains no factual allegations about actual practices, or any agreement in support, and Plaintiffs' speculation about the impacts of the rule is implausible.

Plaintiffs allege, for example, that "the steering effects" of the rule "ensure[] that virtually no Seller or Listing Broker will provide for a buyer broker commission that is significantly out of line with what is 'typical' or 'customary.'" Compl. ¶ 93. Even if that were true, that says nothing about the scope of any agreement. Regardless, Plaintiffs do not plead any facts demonstrating that steering actually occurs or explain how these allegedly "typical" or "customary" rates are set. To the contrary, Plaintiffs' own allegations undermine this far-fetched theory. The theory depends on the premise that buyer-brokers can persuade their clients to actually purchase homes with higher commissions but—as Plaintiffs allege—many prospective homebuyers no longer use a broker to locate prospective homes. Rather, they "have already scoured the market using Zillow or other websites" and selected a home before retaining a buyer-broker. *Id.* ¶ 87. This allegation fatally undermines Plaintiffs' theory that the challenged guideline allows buyer-brokers to steer their clients' home choices based on commission levels, somehow resulting in a standard commission rate.

Likewise, Plaintiffs allege that the rule "*enables* brokers and agents … to discipline

Listing Brokers who might stray from the norm by refusing to show their properties to prospective buyers or only showing them after showing properties advertising the expected commission," Compl. ¶ 94 (emphasis added). Beyond this conclusory assertion, the complaint has no allegations detailing the so-called norm or identifying even a single instance of "discipline," and contains no explanation of how the rule facilitates this outcome. Again, this allegation appears to be copied from the NAR lawsuits, without any thought given or detail provided about how it makes sense here.

Plaintiffs also assert that "the option to list zero dollars as the Buyer Broker's commission is little more than a smokescreen, giving the appearance that actors in the market are free to negotiate and compete on price, when in fact they are not," Compl. ¶ 95. But again, conclusory assertions aside, the complaint contains no *allegations* illustrating this supposed "smokescreen" or how that might even work. If anyone wants to list a zero price commission, pursuant to the terms of the alleged rule, they can. If anyone chooses *not* to do so, that is a unilateral decision that the antitrust laws do not reach. At bottom, none of Plaintiffs' arguments are about inherent features of the challenged rule, and Plaintiffs have not alleged a plausible basis to allege that brokers agreed to flout the stated rule. Thus, at most, their allegations amount to parallel conduct responding to shared economic incentives, which does not suffice under *Twombly*.

### c. Mere participation in a membership organization is not anticompetitive

Without alleging a specific agreement, Plaintiffs' claim boils down to a theory that Defendants' participation in a membership-based organization and adherence to its guidelines is a conspiracy. But a membership-based organization like "a trade association is not by its nature a 'walking conspiracy.'" *Consol. Metal Prods., Inc. v. Am. Petrol. Inst.*, 846 F.2d 284, 293-294

(5th Cir. 1988). That is, "concerted action does not exist every time a trade association member speaks or acts. Instead, in assessing whether a trade association (or any other group of competitors) has taken concerted action, a court must examine all the facts and circumstances to determine whether the action taken was the result of some agreement, tacit or otherwise, among members of the association." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007-1008 (3d Cir. 1994).

To that end, the Third Circuit has expressly held that allegations that members of a trade association chose to follow the association's rules—even along with allegations that members controlled the organization—are not sufficient to plead a conspiracy in violation of Section 1 of the Sherman Act. In *In re Insurance Brokerage Antitrust Litigation*, the plaintiffs alleged that defendant insurance brokers conspired to conceal fellow brokers' receipt of commission payments in return for steering customers to certain insurers. 618 F.3d 300, 311-313 (3d Cir. 2010). According to plaintiffs in that case, the defendants carried out a conspiracy by participating in a trade association, exercising "control" over the association's affairs, "adopt[ing]" an allegedly anticompetitive policy governing disclosure of commission payments, and adhering to that policy. *Id.* at 313, 349. In other words, exactly what Plaintiffs do here. The Third Circuit rejected that theory and upheld the dismissal of the complaint for failure to plead concerted action, explaining that "neither defendants' membership in the [trade group], nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy." *Id.* at 349. Nor did allegations "that the defendant brokers collaborated in crafting" the challenged policy "insofar as [they] allegedly 'control[led]' the affairs of [the trade association]." *Id.* Thus, the Third Circuit requires more than a bare allegation of "collaborate effort" through an association to plead an individual member's conscious commitment to conspiracy. *Id.* at 350.

That requirement defeats Plaintiffs' claims. The Third Circuit held that the allegations in *In re Insurance Brokerage Antitrust Litigation* were not enough even though the complaint there alleged that the defendants "sat on [the association's] Board of Directors" and thus "effectively operated and controlled the [association]." 618 F.3d at 381. Similarly, the Ninth Circuit held that "participation on [an] association's board of directors is not enough by itself" for liability under Section 1 of the Sherman Act. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). And the Fourth Circuit held that the promulgation of allegedly anticompetitive association standards did not establish the requisite concerted action even though the plaintiff alleged that "some of the defendants' representative[s] served on the relevant standard-setting panel." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 436 (4th Cir. 2015); *see also id.* at 437 (finding that simply asserting that "a collective decision was made" by parties with purportedly anticompetitive aims did not establish a conspiracy among all members of the association). Because membership and participation in WPML are all Plaintiffs allege, they fail to plausibly allege an agreement.

### d. Plaintiffs do not allege any other agreement among the brokerages

Even if the Court concludes that Plaintiffs have plausibly alleged a vertical agreement between each Brokerage Defendant and WPML based solely on participation in WPML, the complaint still fails to state a claim because it does not plausibly allege—as it must to state a price-fixing claim—an agreement among the Brokerage Defendants. The complaint does not, for example, allege that particular Brokerage Defendants *ever* communicated with each other about the challenged WPML rule, let alone its potential impact on commission rates. Instead, the allegations of a conspiracy among the Brokerage Defendants are textbook allegations of parallel conduct—Brokerage Defendants allegedly adopting and enforcing the Commission Disclosure Rule—followed by "a bare assertion of conspiracy." *Twombly*, 550 U.S. at 556. The complaint

thus cannot survive a motion to dismiss. *See, e.g.*, *Burtch*, 662 F.3d at 231 (affirming dismissal of antitrust claim where allegations lacked specificity).

Without an alleged agreement among the Brokerage Defendants, the alleged conspiracy fails because it is, at very most, a "rimless" wheel conspiracy, which courts repeatedly have held cannot establish an antitrust conspiracy. That form of agreement—which resembles "separate spokes meeting at a common center … without the rim of the wheel to enclose the spokes"—is not "a single conspiracy" at all. *Kotteakos v. United States*, 328 U.S. 750, 755 (1946). "Rimless wheels" are merely allegations of parallel conduct. Accordingly, the Third Circuit has affirmed the dismissal of Sherman Act claims on the grounds that plaintiffs failed to plead a horizontal agreement, that is, a "rim" connecting the spokes. *See Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (explaining that plaintiff failed to adequately allege "an agreement among the Dealers themselves"). And every other circuit to address the question—the Second, Fourth, Fifth, and Sixth—has also "held rimless hub-and-spokes conspiracies do not violate § 1 of the Sherman Act." *See In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at *7 (D. Minn. Apr. 5, 2022) (citing *Target Corp. v. LCH Pavement Consultants, LLC*, 2013 WL 2470148, at *6 (D. Minn. June 7, 2013)). Thus, even if the Court accepts Plaintiffs' conclusory group-wide allegations that each Brokerage Defendant has an individual agreement with WPML to adhere to and enforce the Commission Disclosure Rule (and accepts Plaintiff's suggestion that the Rule is somehow anticompetitive, which it is not), Plaintiffs have not plausibly alleged a conspiracy among the Brokerage Defendants themselves.

**C.    The Rule Of Reason Applies To Plaintiffs' Antitrust Claim And Plaintiffs Fail To State A Claim Under The Rule Of Reason Because They Do Not Allege A Plausible Market**

Even if Plaintiffs did plausibly allege an agreement, their antitrust claim still must be dismissed under the rule of reason for failure to allege a plausible relevant market. A rule of

reason analysis applies here because Plaintiffs have not plausibly alleged that the challenged WPML rule is so obviously anticompetitive that the Court can condemn it as *per se* unlawful. Under the rule of reason, Plaintiffs' claims fail. Plaintiffs have not alleged a plausible product market, both because their market definition is too narrow, and because their claims concern a two-sided market—an MLS, which brings property buyers and sellers together—but their allegations entirely ignore the buyer side of that market.

> 1.     **The Rule Of Reason Applies Because Plaintiffs Have Not Adequately Alleged A *Per Se* Violation**

Courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Condemning an agreement as *per se* unlawful is a rare exception for which "a restraint must have manifestly anticompetitive effects … and lack … any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citation omitted). Accordingly, courts "take special care not to deploy" *per se* liability unless they "have amassed '*considerable experience* with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'" *NCAA v. Alston*, 594 U.S. 69, 89 (2021) (citations omitted; emphasis added). Plaintiffs' allegations fall far short of this high bar.

> a.     **The type of agreement alleged is generally subject to rule-of-reason analysis**

As a general matter, the category of agreement that Plaintiffs allege here—vertical agreements of a membership organization—is not subject to *per se* treatment. The rule of reason unquestionably applies to the vertical restraints that Plaintiffs allege between WPML and the Brokerage Defendants. *See Leegin*, 551 U.S. at 886. In addition, even if Plaintiffs plausibly alleged a horizontal agreement (which they have not), courts have held that *per se* treatment is

not appropriate where, as here, a plaintiff challenges "restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities." *Texaco*, 547 U.S. at 7. Indeed, "[i]n analyzing whether a trade association agreement restrains competition in the profession, federal courts have most frequently applied the 'rule of reason.'" *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1137 (8th Cir. 1981) (collecting cases); *see also Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 89 F.4th 430, 435 (3d Cir. 2023) (applying rule of reason to allegations of price-fixing by a trade association and its members).

### b. The WPML guidelines do not have obviously anticompetitive effects

Plaintiffs have not plausibly alleged that the Commission Disclosure Rule so obviously has anticompetitive effects that the Court need not examine its real-world effects. The primary anticompetitive effect is supposedly inflated commissions. Compl. ¶ 122. A *per se* violation requires at least that the alleged conspiracy was "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing" prices. *United States v. Gillen*, 599 F.2d 541, 545 (3d Cir. 1979). Here, the allegations that the challenged rule caused the adoption and maintenance of fixed commission rates are implausible.

Plaintiffs do not plausibly allege an explicit price-fixing agreement, nor could they. WPML's Commission Disclosure Rule is purely informational; it does not specify any amount whatsoever, leaving it entirely within the discretion of listing brokers to decide how much compensation—if any—to offer buyer-brokers. As explained, the rule expressly contemplates that some listings "do not offer compensation to the Buyer's agent," and states that listings should "indicat[e] $0.00 if no compensation is being offered." Compl. ¶ 62. It further provides, as Plaintiffs concede, that "broker commissions are subject to negotiation between the seller and

the Listing Broker." *Id.* ¶ 63. And it provides that "Listing Broker[s] may modify the [commission] offered to other Brokers without notifying the WPML Office of such modification as the WPML plays no role in such negotiations." WPML Rules and Regulations § 3.21(J).

Despite the fact that the Commission Disclosure Rule expressly contemplates zero-dollar commission offers and the negotiation of commissions, Plaintiffs claim that "the reality is that many agents represent to sellers that a 2.5-3.0% buyer broker commission is 'standard' and further discourage negotiation to lower the commission offered." Compl. ¶ 63; *see also id.* ¶¶ 93-95. That may be true, but Plaintiffs do not allege facts explaining how these representations are connected to the challenged rule itself, or how they reflect any agreement. Common prices alone do not suggest price-fixing. *See Twombly*, 550 U.S. at 553-554.

Likewise, no other WPML guideline that Plaintiffs raise plausibly has the effect of fixing buyer-broker commissions. Plaintiffs note that WPML's rules provide that "'[f]ines will be imposed to the Listing Agent for incomplete listing data … including failing to list the amount of commission (including zero) that the Buyer Broker will receive." Compl. ¶ 64. But again, that provision does not tie fines to failure to offer any particular commission rate or even a commission at all. To the contrary, it explicitly provides that "zero (0) is an acceptable answer," and that example rates "are examples only and should not be misconstrued as rates fixed by [WPML]." WPML Rules and Regulations § 10.1(B)(4). Plaintiffs also allege that the standard listing agreements of WPML and the Pennsylvania Association of Realtors require the seller to authorize the listing broker to offer compensation to buyer-brokers. Compl. ¶¶ 65, 67. But use of these standard listing agreements is not mandatory: "WPML does not require a Subscriber to use a listing form other than the form the Subscriber individually chooses to utilize." WPML

Rules and Regulations § 3.5.  And even if they were, this has nothing to do with fixing an amount of compensation.

Plaintiffs also attempt to allege a related anticompetitive effect:  that "[h]ome sellers have been forced to pay commissions to a Buyer Broker … thereby substantially inflating the cost of selling their homes."  Compl. ¶ 81.  This too is unsuccessful.  Plaintiffs fail to allege why folding buyer-broker commissions into the sale price has the net effect of lowering sellers' profits— which they must do to establish that they actually paid inflated prices for selling their homes.  It is far from obvious that having the buyer pay a commission to a broker directly would reduce the sale price by the amount of the commission, but if it did, that would have no impact on the seller's proceeds.  And the converse is more likely true; if the current model results in higher home sale prices than an alternative model, so that sellers ultimately take home more money (even after paying commissions) than if commission payments were divided between buyers and sellers, then it simply does not matter that sellers are paying more in commission dollars.  It is likewise not obvious that having the buyer pay a commission to a broker directly would have the effect of reducing the total commission paid by the seller.  In that case, seller-brokers might be able to charge sellers more for their services.

The 2009 Federal Trade Commission settlement that Plaintiffs raise, Compl. ¶ 68, also counsels against application of the *per se* rule.  That settlement concerned a WPML rule that allegedly precluded the acceptance of any listings into the MLS other than "Exclusive Right to Sell" listings—such as "Exclusive Agency" listings in which the seller pays a flat-fee or reduced commission to the broker for unbundled services and retains the right to sell the home on his or her own.[9]  Notably, despite investigating WPML rules related to listings and commissions, the

---

[9] Decision and Order, *In re West Penn Multi-List, Inc.*, No. C-4247 (Feb. 13, 2009), https://www.ftc.gov/sites/default/files/documents/cases/2009/02/090220westpenncmpt.pdf.

Federal Trade Commission chose *not* to challenge the Commission Disclosure Rule that Plaintiffs challenge here. And the FTC did not require that WPML terminate the rule at issue. That undermines the notion that the conduct challenged here is *per se* unlawful.

### c. The WPML guidelines have facially plausible procompetitive benefits

Rule-of-reason analysis is also required because the Commission Disclosure Rule, on its face, has procompetitive benefits. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (rule-of-reason analysis required unless there is "[n]o credible argument" the conduct "has any … procompetitive effect"). Even price fixing—which Plaintiffs do not squarely allege here—is governed by the rule of reason, rather than being *per se* illegal, if it has compelling procompetitive justifications. *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.* (*BMI*), 441 U.S. 1, 9 (1979); *see also Winn-Dixie*, 89 F.4th at 435 (applying rule of reason to price-fixing claim); *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1010-11 (7th Cir. 2012) (similar). Given the rule's common sense procompetitive benefits, the Court should not "shut[] off the information flow before it begins, by prematurely adopting a rule of blanket illegality." *Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 604 (7th Cir. 1984).

Courts have recognized that, as a general matter, MLSs and the rules that govern them can have procompetitive benefits, which precludes *per se* treatment. It is the cooperation between brokers itself that produces the efficiency-enhancing benefits provided by MLSs. As courts have explained, "a multiple listing service may create significant competitive advantages both for its members and for the general public." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980); *see also United States v. Nat'l Ass'n of Realtors*, 2006 WL 3434263, at *12 (N.D. Ill. Nov. 27, 2006) (same); *Venture Res. Grp., Inc. v. Greater N.J. Reg'l Multiple Listing Serv., Inc.*, 1995 WL 866841, at *3 (D.N.J. Aug. 24, 1995) (collecting cases).

Courts have likewise recognized that rules related to MLS governance can "provid[e] a more transparent marketplace[,]" "aid[] competition[,] and fulfill[] the purposes of the Sherman Act." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006). That is particularly true here, where the challenged rule is purely informational; that is, the Commission Disclosure Rule fosters transparency without requiring listing brokers to offer any compensation at all to buyer-brokers. *See supra* pp. 10, 17. And "it has been recognized by courts that it is essential to the meaningful operation of any multiple listing service to require participants to adhere to certain professional and ethical standards." *Venture Res. Grp.*, 1995 WL 866841, at *3. These standards help "ensure that its members will not be endangered legally or ethically by the brokers with whom they enter into a multiple listing agreement." *O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F. Supp. 111, 115 (E.D.N.Y. 1998).

WPML's rules—including the Commission Disclosure Rule that Plaintiffs challenge here—fit comfortably within this precedent recognizing MLSs' procompetitive benefits. Plaintiffs primarily challenge the rule that WPML listings make blanket unilateral offers of compensation—even if $0—to be paid to the buyer-agent upon sale. *See* Compl. ¶¶ 62, 93. That rule, however, fosters transparency and facilitates smoother real estate transactions by reducing the need for constant individual communications between huge numbers of brokers and reduces friction in the home sale process. Indeed, even some state legislatures have adopted laws that enshrine a seller's right to pay commissions to buyer-brokers. For example, Minnesota law provides that "[t]he seller may, in the listing agreement, authorize the seller's broker to disburse part of the broker's compensation to other brokers, including the buyer's brokers solely representing the buyer." Minn. Stat. Ann. § 82.70; *see also* 225 Ill. Comp. Stat. 454/10-5 (Illinois); Del. Code Ann. tit. 24, § 2930 (Delaware); Md. Code Ann., Bus. Occ. & Prof. 17-534

(Maryland); N.J. Admin. Code 11:5-6.2 (New Jersey); D.C. Code Ann. § 42-1703(f) (Washington, D.C.).

It is not just realtors or MLSs that view this type of guideline as procompetitive. The Supreme Court held that blanket licenses for copyrighted musical compositions had procompetitive benefits (and so had to be analyzed under the rule of reason) because a "*middleman* with a blanket license was an obvious necessity if the thousands of individual negotiations, a virtual impossibility, were to be avoided." *BMI*, 441 U.S. at 20 (emphasis added); *see also id.* ("[I]ndividual fees for the use of individual compositions would presuppose an intricate schedule of fees and uses, as well as a difficult and expensive reporting problem for the user and policing task for the copyright owner."). Likewise here, requiring sellers to include an initial opening offer for buyer-broker commission in their listings (potentially an offer of zero) reduces transaction costs. Courts have held that disclosing set commission rates in advance provides a more transparent marketplace in a manner that does not violate antitrust law, explaining that "potential cooperating brokers" are "entitled to information concerning the rate of commission the listing broker is to receive from the seller and how that commission will be apportioned in order to decide whether a subagency relationship should be established." *Murphy v. Alpha Realty, Inc.*, 1978 WL 1451, at *4 (N.D. Ill. Dec. 7, 1978); *see also Supermkt. of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 1983 WL 2199, at *7 (C.D. Cal. Sept. 1, 1983) *aff'd*, 786 F.2d 1400 (9th Cir. 1986) (similar).

Finally, folding buyer-broker commissions into the sale price benefits sellers by reducing the barrier to entry for buyers and thus drawing more potential buyers—which increases the chance of sale and raises prices because of increased competition for homes. For example, buyers may be more likely to purchase a home or secure financing if they can pay less cash

upfront, such as by not paying a buyer-broker commission. Meanwhile, sellers are not harmed: The burden sensibly falls on the party who is generating cash from the transaction (the seller) as opposed to the party who is likely financing most of the purchase price already.

At this stage, Defendants do not ask the Court to decide the existence of these benefits, or weigh them against any anticompetitive harm. Instead, Defendants point to these potential benefits, which are clear on the face of Plaintiffs' complaint, to support the Court selecting a mode of analysis that would allow full and fair consideration of these obvious procompetitive benefits in the event of a trial on the merits.

### 2. The Complaint Fails To State A Claim Under The Rule Of Reason Because Plaintiffs Have Not Pleaded A Plausible Relevant Market

Because Plaintiffs fail to allege a *per se* antitrust violation, they can proceed with their Sherman Act claim only if they state a claim under the rule of reason. *See, e.g.*, *Burtch*, 662 F.3d at 222. That requires alleging facts that render each of the following plausible: (1) a definition of the relevant product market, (2) the Defendants' market power, and (3) the likely anticompetitive effects from the restraint within that market. *See Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 336 (3d Cir. 2018). Plaintiffs have not met their burden to plausibly define a relevant product market, *see id.* at 337, for two reasons.

*First*, Plaintiffs' product market definition is too narrow because it does not include all interchangeable options to brokerage services. *See Satnam Distribs. LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405, 420 (E.D. Pa. 2015). A product market must consist of products that compete because they are "reasonably interchangeable." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). Although Plaintiffs discuss alternatives to MLSs, Compl. ¶¶ 109-112, they do not discuss alternatives to *brokerage services* (*e.g.* private sales between buyers and sellers) or acknowledge that brokerage services themselves can differ

so much that they may constitute different products. For example, in *Realcomp II, Ltd. v. FTC*, the Sixth Circuit explained that some brokers offer limited-service brokerage services, such as "Exclusive Agency agreements" which involve "a la carte, or unbundled, brokerage services, with a compensation structure characterized by an up-front fee to the listing broker rather than a commission." 635 F.3d 815, 821-822 (6th Cir. 2011). Indeed, these are precisely the type of limited services that were the subject of WPML's 2009 settlement with the FTC, and that WPML accordingly allows. *See supra* pp.19-20; Compl. ¶ 68. Plaintiffs' own allegations therefore undercut the plausibility of their market definition.

*Second*, Plaintiffs allege a two-sided market—"the bundle of services provided to home buyers and sellers by residential real estate brokers with MLS access," Compl. ¶ 99—but focus only on the impact on sellers instead of the effects on the overall market. Two-sided markets are markets "in which one or several platforms enable interactions between end-users and try to get the two (or multiple) sides 'on board' by appropriately charging each side." *See* Rochet & Tirole, *Two-Sided Markets: A Progress Report*, 37 Rand J. Econ. 645 (2006). In two-sided markets, platforms bring two different groups of users—such as buyers and sellers—together by offering different products or services to each group, which depend on the platform to intermediate between them. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 535 (2018). In the market for real estate brokerage services, a multiple listing service (the platform) intermediates between brokers for home buyers and sellers and facilitates real estate transactions. *See* Evans, *The Antitrust Economics of Multi-Sided Platform Markets*, 20 Yale J. on Reg. 325, 338, 374 (2003) (classifying real estate market as a two-sided market). "[T]he value of the two-sided platform to one group of participants depends on how many members of a different group participate." *Am. Express Co.*, 585 U.S. at 535. Thus, for two-sided platforms, "the relative

price structure matters, and platforms must design it so as to bring both sides on board." *Id*. at 536.

Plaintiffs' myopic focus on the effects on the seller-side of the market for real estate brokerage services is fatal to their claims. *See, e.g.*, Compl. ¶¶ 2, 6, 12, 50, 81, 122. In cases involving two-sided transaction platforms (like this one), allegations of harm "must include both sides of the platform," *Am. Express Co.*, 585 U.S. at 544, since "competition cannot be accurately assessed by looking at only one side of the platform in isolation," *id.* at 546. Plaintiffs fail to even consider the impact on the buyer-side of the market, and of course, under Plaintiffs' theory, buyers benefit significantly by receiving broker services for free.

Only highlighting the infirmity of Plaintiffs' relevant market allegations, there are pending class action lawsuits on the buyer side of the market too, which claim that sellers are *benefitting* from the challenged guidelines through increased demand for homes. *See, e.g.*, *Batton v. Compass, Inc.*, No. 1:23-cv-15618 (N.D. Ill.). These dueling theories of liability illustrate why *American Express* governs here. Thus, the complaint should be dismissed because Plaintiffs have failed to meet their burden to plead a plausible product market.

## II. Plaintiffs' CPL Claim Must Be Dismissed

Plaintiffs' CPL claim must be dismissed for two reasons. *First*, Plaintiffs fail to plausibly allege elements of the claim. A necessary predicate to any deception claim is a statement or omission from the Defendant to the Plaintiff. Plaintiffs challenge an *internal* guideline they do not claim to have heard, read, or seen and unspecified statements made by unspecified brokers to unspecified clients. Plaintiffs cannot plausibly claim to have been deceived by statements they were unaware of. Relatedly, Plaintiffs have not plausibly alleged justifiable reliance, as they must, because they identified no statement made by any Defendant on which they relied or that otherwise influenced their home sale. *Second*, Plaintiffs have no right to bring their CPL claim

because they did not purchase buyer-broker services from any Defendant. If that were not enough, Plaintiffs also have no private right of action as to WPML and Howard Hanna because they do not allege that they engaged in *any* commercial transaction with those Defendants. Plaintiffs cannot have been deceived by companies with whom they never interacted.

## A. The Complaint Fails To State A Claim Under The CPL

"To state a cognizable [CPL] claim, a plaintiff must establish that the defendant engaged in an activity proscribed under the law, that the plaintiff 'justifiably relied on the defendant's wrongful conduct or representation and … suffered harm as a result of that reliance.'" *Loduca v. WellPet LLC*, 549 F. Supp. 3d 391, 400 (E.D. Pa. 2021) (quoting *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 221 (3d Cir. 2008)). Plaintiffs plead no facts suggesting that Defendants engaged in any deceptive conduct or that Plaintiffs relied on such conduct in purchasing their homes.

### 1. The Complaint Does Not Plausibly Allege That Defendants Engaged In Deceptive Conduct

Plaintiffs fail to plausibly allege that Defendants engaged in any conduct with "the capacity to deceive," as required to state their claim under the CPL's catch-all provision barring "any … fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4)(xxi); *Gregg v. Ameriprise Fin., Inc.*, 664 Pa. 567, 584-586 (2021). That is so for four reasons: (1) Plaintiffs do not allege that Defendants made any representations to them; (2) Plaintiffs do not allege that the Commission Disclosure Rule was false or misleading; (3) the statements that Plaintiffs allege were made by unspecified listing brokers are non-actionable puffery; and (4) to the extent Plaintiffs are advancing an omission theory, they fail to allege that listing brokers had a duty to disclose anything.[10]

---

[10] Section 201-2(4)(xxi) encompasses both deceptive and fraudulent conduct, but Plaintiffs alleged only that Defendants' conduct was deceptive. *See* Compl. ¶¶ 114(f), 139.

*First*, and most fundamentally, Plaintiffs do not plausibly allege that the Commission Disclosure Rule and theoretical statements about commission rates are deceptive because they do not allege any Defendant made any such representation at all, let alone to them. A representation never made lacks "capacity to deceive." Plaintiffs' theory of deception therefore is facially implausible and does not satisfy Rule 8. *See Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (Rule 8 requires that a "claim must have 'facial plausibility'" (quoting *Iqbal*, 556 U.S. at 678)). And because Plaintiffs fail to identify any "specific act, omission or misrepresentation" by any Defendant, they cannot "demonstrate that [the alleged] confusion or misunderstanding was caused by certain acts or omissions on the part of the Defendants," as the CPL requires. *See Doherty v. Allstate Indem. Co.*, 2016 WL 5390638, at *6 (E.D. Pa. Sept. 27, 2016).

*Second*, the Commission Disclosure Rule has no capacity to deceive as a matter of law because it is not false or misleading. The rule "requires that the Listing Broker include and designate … the compensation being offered by the Listing Broker to the Selling Broker," including "by indicating $0.00 if no compensation is being offered," WPML Rules and Regulations § 3.21(J), and that is what listing brokers do. These requirements are not confusing or misleading, and Plaintiffs do not allege otherwise.

*Third*, a statement that commission rates are "typical" or "standard" is non-actionable puffery. Plaintiffs allege these "statements" would be deceptive because the commission rates are "the result of anticompetitive collusion among brokers." Compl. ¶ 143. But even were the Court inclined to credit at this stage of the case Plaintiffs' misguided theory of collusion, that would still not give rise to a valid claim of deception. That is because the challenged *statements* are nothing more than "[v]ague promises of … competiti[on]" and thus are puffery that is not actionable under the CPL. *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 416 (E.D.

Pa. 2016) (collecting cases holding that "no court has found that such broadly worded claims of affordability were actionable"); *see Corsale v. Sperian Energy Corp.*, 412 F. Supp. 3d 556, 563 (W.D. Pa. 2019) ("[P]uffery—'exaggeration or overstatement expressed in broad, vague, and commendatory language'—is not actionable under the UTPCPL.").

*Fourth*, to the extent that Plaintiffs intend to maintain an (unalleged) failure-to-disclose theory, they cannot because such theory requires a plaintiff to "plead and prove a duty to disclose," *Halpern v. Ricoh U.S.A., Inc.*, 299 A.3d 1023, 1029 (Pa. Super. Ct. 2023), and Plaintiffs entirely fail to allege that Defendants had any such duty.

### 2. The Complaint Does Not Plausibly Allege Justifiable Reliance

Because Plaintiffs do not allege any deceptive conduct, they necessarily do not plausibly allege the requisite "justifiabl[e] reli[ance] upon" the allegedly deceptive statement "when making the purchasing decision." *Gregg*, 664 Pa. at 582. To adequately allege justifiable reliance, Plaintiffs must allege that Defendants' "deception induced them to purchase their services or engage in any other detrimental activity." *Hunt*, 538 F.3d at 227. Plaintiffs have not satisfied this requirement because they have alleged neither that they "heard or believed" the alleged deception or that it "influence[d]" any decision relating to their home sale. *See Weinberg v. Sun Co.*, 565 Pa. 612, 618 (2001); *Doherty*, 2016 WL 5390638, at *5.

Plaintiffs do not allege that they heard or believed either statement at issue. As for the Commission Disclosure Rule, the complaint does not even allege that Plaintiffs were aware of the rule when they contracted with Defendants for listing broker services—which is not surprising. That rule, like all of WPML's rules, is directed toward the broker, not the consumer, because only subscribing brokers have access to the WPML database. Compl. ¶ 59. Similarly, a claim based on brokers' statements about commission rates fails for the simple reason that Plaintiffs have not alleged that *their* listing brokers made representations to them about whether

the commission rate they agreed to was "standard" or "typical." Instead, they allege only that they "relied on their Listing Brokers as their agents for the sale of their homes and as experts in the field of residential real estate sales," *id.* ¶ 144, which is insufficient to support a CPL claim both because Plaintiffs fail to allege any *conduct or representations* by Defendants and because the allegation is conclusory. *See In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F. Supp. 3d 514, 542 (M.D. Pa. 2021) (dismissing CPL claim because complaint included "a single, conclusory allegation" that plaintiffs "relied on [defendant's] misrepresentations").

Nor do Plaintiffs allege that had they known, generally, about Defendants' supposed anticompetitive collusion they would have, for example, used a different listing broker, offered a different buyer-broker commission, or not sold their home at all. This Court therefore would be "hard-pressed to understand how [their] knowledge that a market … is inefficient would influence [their] decision[s]." *Hunt*, 538 F.3d at 228.

**B. Plaintiffs Have No Private Right Of Action Under The CPL**

**1. Plaintiffs Do Not Allege That They Purchased Buyer-Broker Services From Any Defendant**

A person may bring a private action under the CPL only if he or she "purchase[d] or lease[d] goods or services" from the defendant. 73 Pa. Cons. Stat. § 201-9.2(a). The CPL's private right of action does not extend to individuals who were "indirectly injured" by a defendant's conduct if they were not a "purchaser or consumer." *Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 65 (3d Cir. 1994). Plaintiffs argue that they were harmed by Defendants' conduct because it resulted in "inflated buyer broker commissions paid by home sellers." Compl. ¶ 84. However, they admit that the buyer broker is compensated by the listing broker, *not* the home seller. *Id.* ¶ 45. In other words, Plaintiffs did not compensate buyer brokers for their services and thus are not purchasers of buyer-broker

services.  Plaintiffs therefore cannot bring a CPL claim based on allegedly inflated buyer-broker commissions, and the claim must be dismissed.  *Latuska v. Sethuraman*, 2016 WL 4082738, at *6 (W.D. Pa. July 29, 2016) (dismissing CPL claim where plaintiffs failed to allege "that they purchased goods or services from" defendant).

### 2. Plaintiffs Do Not Allege Any Commercial Relationship With WPML Or Howard Hanna

The only Defendant that Plaintiffs allege they had any relationship with is Berkshire Hathaway, which served as the Moratises' listing broker.  Compl. ¶ 20.[11]  Plaintiffs did not have any commercial relationship whatsoever with WPML[12] or Howard Hanna.  The CPL does not extend a private cause of action to plaintiffs "lacking any commercial dealings with the defendant."  *Duffy v. Laws. Title Ins. Co.*, 972 F. Supp. 2d 683, 694 (E.D. Pa. 2013) (citing *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 57 (3d Cir. 1992)).  That provides an additional reason for dismissal of the CPL claim against WPML and Howard Hanna.

### CONCLUSION

For the foregoing reasons, Defendants respectfully ask that the Court dismiss Plaintiffs' complaint with prejudice because amendment would be futile, especially given Plaintiffs' multiple amendments.  *Steel Valley Sch. Dist.*, 706 F.3d at 217 (dismissal with prejudice is appropriate where amendment would be inequitable or futile).

---

[11] Defendant Berkshire Hathaway does not join this argument.  Plaintiffs allege that the Kays, Slavics, and Ms. Iannome used non-moving defendant Realty ONE as a listing agent.  *See* Compl. ¶¶ 19, 21-22.

[12] By Plaintiffs' own admission, "[n]on-subscribers cannot list properties with [WPML] and, furthermore, non-subscribers do not have access to the [WPML] database."  Compl. ¶ 59.  In other words, WPML is inherently a broker-facing and not consumer-facing entity.  Plaintiffs do not allege they are WPML subscribers or brokers or that they ever purchased goods or services from WPML.

Dated: June 4, 2024

Respectfully submitted,

/s/ Wendelynne J. Newton
BUCHANAN INGERSOLL & ROONEY PC
Wendelynne J. Newton
wendelynne.newton@bipc.com
(Pa. I.D. No. 35163)
Gretchen L. Jankowski
gretchen.jankowski@bipc.com
(Pa. I.D. No. 74540)
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-443
Tel: (412) 562-8800
Fax: (412) 562-1041

*Attorneys for Defendant West Penn Multi-List, Inc.*

/s/ Kathy K. Condo
Kathy K. Condo, Esq. (Pa. I.D. No. 34910)
Carla M. Castello, Esq. (Pa. I.D. No. 326808)
BABST, CALLAND, CLEMENTS
    AND ZOMNIR, P.C.
Two Gateway Center, 6th Floor
603 Stanwix Street
Pittsburgh, PA 15222
(412) 394-5400
kcondo@babstcalland.com
ccastello@babstcalland.com

*Attorneys for Everest Consulting Group LP d/b/a Berkshire Hathaway HomeServices The Preferred Realty*

/s/ David Z. Gringer
David Z. Gringer*
Emily Barnet*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
emily.barnet@wilmerhale.com

Seth P. Waxman*
Karin Dryhurst*
Claire M. Bergeron*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com
karin.dryhurst@wilmerhale.com
claire.bergeron@wilmerhale.com

Eric G. Soller
Pa. I.D. No. 65560
William Pietragallo II
Pa. I.D. No. 16413
Quintin DiLucente
Pa. I.D. No. 330648
PIETRAGALLO GORDON ALFANO
    BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Fl.
Pittsburgh, PA 15219
(412) 263-1836
EGS@Pietragallo.com
WP@Pietragallo.com
QD@Pietragallo.com

*Attorneys for Howard Hanna Company*

*Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 4, 2024, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to the attorneys of record registered with the CM/ECF system.

*/s/ David Z. Gringer*
David Z. Gringer